**SO ORDERED.**

**SIGNED this 08 day of March, 2007.**



_____
**ROBERT E. NUGENT**
**UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **GARY DEAN BROCK,** | ) | **Case No. 05-19362** |
| | ) | **Chapter 13** |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

### MEMORANDUM OPINION

The Court heard evidence on confirmation of debtor Gary Brock's chapter 13 plan and the United States Trustee's motion to convert the case to chapter 7 at a trial held October 17, 2006. The Court also heard argument concerning the debtor's objections to the separate claims of Rebecca Brandewyne, Verne Thornton, Beverly Thornton, and John Cox (collectively "Claimants"). Debtor appeared in person and by his counsel, David Hiebert. The United States Trustee ("UST") appeared by Richard Wieland. The standing chapter 13

-1-

Case 05-19362   Doc# 137   Filed 03/08/07   Page 1 of 22

trustee, Laurie Williams ("Trustee"), appeared pro se as did claimants Rebecca Brandewyne and Beverly Thornton. Claimants Verne Thornton and John Cox did not appear. The following are the Court's findings of fact and conclusions of law, made pursuant to Fed. R. Bankr. P. 7052.

**Jurisdiction**

These are core proceedings over which this Court has subject matter jurisdiction.[1]

**Background**

This case was filed on October 14, 2005.[2] Brock filed his initial chapter 13 plan with his petition. In that plan, he proposed to pay $101 per month for a term of up to 36 months.[3] These funds were to be distributed by the Trustee, first to her fees, then to administrative expenses, with any remainder being paid pro rata to Brock's unsecured creditors. Debtor's plan drew an objection from the Trustee.[4] In addition, the UST filed a motion to convert the case for cause under § 1307(c), asserting unreasonable delay prejudicial to creditors due to debtor's alleged failure to make full and complete disclosures on his schedules.[5] The

---

[1] 28 U.S.C. § 157(b)(2)(B) and (L) and § 1334(b).

[2] This bankruptcy case was filed prior to the October 17, 2005 effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA). Unless otherwise noted, all future statutory references are to the Bankruptcy Code, 11 U.S.C. §101, et seq. as it was in force prior to BAPCPA.

[3] Dkt. 2.

[4] Dkt. 15. The Trustee objected on the grounds of good faith, debtor's eligibility for relief in chapter 13 and the liquidation test. *See* § 1325(a)(1), (3) and (4).

[5] Dkt. 10.

-2-

confirmation issues and the UST's motion tracked together through discovery and pre-trial proceedings.

On October 13, 2006, immediately before the October 17 trial, Brock amended his plan. The amended plan proposed paying twelve monthly payments of $101 commencing November of 2005, and monthly payments of $151 for the next 48 months.[6] If Brock obtains other employment, he will amend his payments to devote as much of his disposable income to his plan as possible. All parties consented to a prompt hearing on confirmation of the amended plan. Subsequent to the hearing, the Trustee and the Claimants filed their written objections to debtor's amended plan.[7]

The Trustee objects to Brock's plan confirmation on the following grounds: (1) a lack of regular income rendering Brock ineligible for chapter 13 relief; (2) Brock's lack of good faith; and (3) an inability to determine Brock's disposable income. At the same time, the UST asserts in its motion to convert that Brock's petition and schedules contain knowing falsehoods and that Brock has failed to disclose his income.

The Claimants also object to confirmation on the basis of lack of good faith, contending that Brock has filed chapter 13 to escape potential tort liability resulting from a book Brock authored that is the subject of a pre-petition state court libel action.[8] Claimant

---

[6] Dkt. 89.

[7] Dkt. 104 and 105.

[8] *Brandewyne et al. v. Brock et al.*, Case No. 04-CV 4363 (District Court of Sedgwick County, Kansas). The plaintiffs' claims against Brock in this state court case have been stayed as a result of Brock's bankruptcy filing. Stay relief was granted to permit the plaintiffs to pursue

-3-

Brandewyne, one of debtor's former wives, filed a proof of claim for $500,000 pertaining to the state court lawsuit as did Brandewyne's current husband Claimant Cox, in the amount of $150,000. [9] Claimants Thornton are Brandewyne's mother and father and have also filed claims against debtor relating to the state court action.[10] Debtor objected to each of these claims and the claims objections were continued to the confirmation hearing.[11] Claimants Cox and Verne Thornton failed to appear on the day of trial and the Court sustained the debtor's objections to their claims.[12] The claims of Brandewyne and Beverly Thornton were continued for a separate evidentiary hearing and remain, pending a determination on the UST's motion to convert.

For his part, Brock contends that he filed this bankruptcy to "get on with his life" without interference from Brandewyne.

### **Findings of Fact**

What follows here is one of the more improbable tales this Court has heard. According to Brock's Schedule I, on the petition date, he was employed by Ryan Property Management, a business that is owned by his mother Charlene Ryan and operated by him.

---

their claims against the publisher of the book. *See* Dkt. 57. The Claimants' claims remain unliquidated.

[9] Proof of Claim No. 4 and No. 5.

[10] Proof of Claim No. 6 in the amount of $300,00 and Proof of Claim No. 7 in the amount of $150,000.

[11] Dkts. 32-35.

[12] Dkts. 94, 128 and 129.

-4-

The business owns four properties, two of which it rents. The two unrented properties are 2005 S. Waco (where Ryan lives) and 7623 E. 26th Ct. North (where Brock's most recent ex-wife, Debra, lives). Brock receives about $1,900 a month for managing the properties and reports this as income on his amended Schedule I. Mrs. Ryan withholds all but approximately $150 and pays Brock's withholding, his rent payment (to herself), and various other living expenses. According to Brock's testimony, he physically receives no monthly paycheck; instead, after Ryan pays Brock's various monthly obligations he receives the approximate $150 left, presumably in cash.

Apart from his "income," Brock owns little property other than a car. According to the vehicle certificate of title, Mrs. Ryan's late husband, Carl Ryan, and Brock are the co-owners of a 1998 Porsche Boxster that Brock drives.[13] The elder Ryans purchased the Porsche for Brock before Carl died. Debra, Brock's immediate ex-wife, owns and drives a 2003 Hummer that Brock is also allowed to use when he is transporting his and Debra's son.

Brock and Debra were married in May of 2000 and divorced in May of 2002 in uncontested proceedings.[14] Brock and Debra lived at the E. 26th Ct. North property during the marriage. In May of 2003, Debra gave birth to Brock's son, Gary II, and the boy lives with Debra at the E. 26th Ct. North property which Debra received in the divorce. Brock visits him there and often spends the night, although Debra testified that the visits are nonconjugal in nature.

---

[13] Ex. 15.

[14] Ex. F.

There is considerable controversy about where Brock actually resides. He says he lives in the basement of his mother's home on South Waco in downtown Wichita and has since his divorce from Debra in May of 2002. This is the address Brock gave in his bankruptcy petition. Yet, on his food stamp application, and on other documents completed by him or his ex-wife, his residence is usually listed as the E. 26th Ct. North property in Wichita's affluent northeastern suburbs (an area where few food stamp patrons appear to reside). This house is also owned by Charlene Ryan who is on the deed and mortgage with Brock and Debra.[15]

Brock claims to have received no income in 2002, 2003, and 2004. He holds degrees in business and marketing. In his response to question 1 on the Statement of Financial Affairs (SOFA) Brock indicates an income of $400 in 2005 as of the filing date but does not know the source of this income.[16] He lived with his mother and step-father during these years and they supported him. At some point in that period, he was convicted of making a false police report in connection with ongoing relations with his penultimate ex-wife, Rebecca Brandewyne, and served some time in the county jail. He is on probation until November, 2006 and testified that he could not leave the state until that probation ended. When Carl Ryan died on August 11, 2005, Gary decided he had to "step up" and help his

---

[15] According to Brock, the Ryans owned this home in 1999 and paid the initial down payment of $30,000 or $35,000 for Brock and Debra when they acquired the property and took out a mortgage loan. Charlene Ryan continues to co-own the house with Debra.

[16] According to Brock this is his income since he began working for and overseeing Ryan Property Management. This employment supposedly began after Carl Ryan died in August of 2005. Brock testified that previous to this employment, he was last employed in 2001.

-6-

mother run Carl's property management business.  As of the petition date, Ryan Property Management was his employer.  In addition to his monthly "salary" of $1,900, the Trustee introduced into evidence a Form 1099 showing that Ryan Property Management paid Brock $5,200 of nonemployee compensation in 2005.[17]  Brock did not disclose this income on his SOFA which he amended the week before trial.[18]

At one time, Brock worked in the insurance business.  But, after his 1996 divorce from  Brandewyne, his fortunes rapidly deteriorated.[19]  As the exhibits and testimony demonstrate, hell indeed has no fury like a woman scorned.[20]  Brock filed a chapter 7 bankruptcy case in 1997 and received a discharge.[21]  Brock says that he lost his permanent employment in 2001 after his employer received a series of anonymous derogatory communications about him.  He attributes these communications to Brandewyne.  Brock's and Brandewyne's legal controversies have been many and varied, including a custody battle over their son, Shane.  They have had numerous domestic court disputes.

Brandewyne writes romance novels.  Brock, in concert with another individual, wrote a novel of his own that was published in 2003, *Paperback Poison: The Romance Writer and*

---

[17]  Ex. 14.

[18]  Dkt. 85, Question 2.

[19]  Brock was married to Brandewyne from 1983 until their divorce in 1996. *See* Ex. L.

[20]  "Heaven has no rage like love to hatred turned / Nor hell a fury like a woman scorned."  William Congreve, *The Mourning Bride*, Act III, Scene 2 (1697).

[21]  *In re Gary Dean Brock*, Case No. 97-11384 (Bankr. D. Kan.).

-7-

*the Hitman*, for which he, the co-author, and the publisher were sued for libel and defamation by Brandewyne, her present husband John Cox, and the Thorntons (her parents) in state court. Brock's misdemeanor conviction arises out of a 2003 incident where he falsely reported that Brandewyne planted a pipe bomb on his porch (at the E. 26th Ct. North property). He has also alleged that Brandewyne sought to have him killed. According to Brock, his inability to secure steady employment is a result of these vitriolic relations with Brandewyne. He believes that she has continued to sabotage his efforts to obtain a job by spreading falsehoods about him to current and prospective employers.

Brock claimed to reside at the South Waco address on the petition date, October 14, 2005. Moreover, he testified on cross examination that he had continuously lived at the Waco address since May of 2002 (his divorce from Debra), except for a two week period in late September-early October when he lived at the E. 26th Ct. North home. Yet, when he applied for food stamps on September 29, 2005, he stated on the application that he lived on E. 26th Ct. North, in the home owned in cotenancy by him, Debra, and the elder Ryans. When he made his application, Brock submitted a "landlord" letter from Carl Ryan dated September 29, 2005, stating that Brock was residing at E. 26th Ct. North as a tenant. On September 29, Mr. Ryan had been dead for six weeks. The Court finds implausible Brock's explanation that Mrs. Ryan wrote the letter and, in grief, signed her deceased husband's name instead.[22] This letter was revealed as part of a food stamp fraud investigation of Brock

---

[22] Charlene Ryan did not testify at trial.

undertaken by the Kansas Department of Social and Rehabilitation Services. Based on the testimony of the State's fraud investigator Jo Wagner, the agency conducted surveillance of the E. 26th Ct. North location in October, examined the trash collected there, and established that Brock was present often, received his mail there, and frequently spent the night. Fraud investigators tailed Brock and examined his garbage over a two week period (October 17-30) in reaching these conclusions. Based upon handwriting samples gathered from the trash and Brock, Wagner concluded that Brock had signed the landlord letter submitted with the food stamps application. An administrative officer later determined food stamp fraud had been committed and Brock lost his food stamp allowance shortly after this case was filed.[23] Ever facile on the witness stand, Brock stated that during this two week surveillance period, he stayed at the E. 26th Ct. North location with his son while Debra dallied with a male companion in Texas. Debra Brock testified that she indeed was absent from the residence during the first week of October, 2005, because she was in Dallas for a party.[24]

Brock's food stamps application completed in late September of 2005 (two weeks prior to his bankruptcy) also contradicts his SOFA and Schedule I. In the application Brock represented that he was unemployed (and had been unemployed for the past 60 days) with no income. On Schedule I, Brock stated that as of the petition date, he had been employed

---

[23] Brock did not appear for the September 2006 administrative disqualification hearing held on Brock's alleged fraud in his food stamps application. *See* Ex. 30.

[24] In connection with the dispute concerning his residence, the Court notes that Exhibit I, a November 2005 lease signed by Gary on behalf of Ryan Property Management for one of the properties it manages, provides for lease payments to be made to him at the E.26th Ct. North address, suggesting he conducts his business from that location.

-9-

for three months by Ryan Property Management and earned $1,900 gross monthly income. One week before trial, Brock filed an amended Schedule I showing that he had been employed by Ryan Property Management for one month prior to filing.[25]

Charlene Ryan made all of Brock's plan payments until April of 2006 by checks written on accounts in her name.[26] Brock then began to pay with money orders. Despite that, the Court finds that Brock's sole means of support is his mother who (1) pays his "salary" or living expenses; (2) provides him with an apartment in the basement on South Waco; (3) bought his car; (4) is the co-owner and comaker on the mortgage on his former home on E. 26th Ct. North; and (5) has paid all of his legal expenses. In addition, Charlene Ryan appears to be a substantial creditor. Although Brock listed her debt at zero on Schedule F, he offered in evidence a letter from her outlining his indebtedness to her of over $69,000.[27] However, neither Charlene nor Brock has filed a proof of claim for her in this case. Charlene is also the account holder on the Chase Bank credit card Brock uses.[28] He lists this credit card debt on Schedule F.

In addition to the questions surrounding his residential address there are several inconsistencies on Brock's petition and schedules. These inconsistencies form the bases for denying confirmation and converting this case to chapter 7 liquidation.

---

[25] Dkt. 83 filed October 12, 2006.

[26] Ex. 3.

[27] Ex. H.

[28] Ex. 16.

-10-

Brock filed amended Schedules in this case after various inaccuracies were called to his attention by the UST or the Trustee. He waited until the week before trial to amend his SOFA, Schedule I and Schedule J. Principal among the omissions on his first filings was any mention of the food stamps, either as income on Schedule I or in response to question 2 of the SOFA pertaining to "other" income. His Schedule J reflects the $50 loan payment he purportedly makes to Charlene Ryan although the payment is not mentioned in the plan. Charlene claims Brock owes her over $69,000 for loans and money she paid his lawyers during his many legal encounters yet Brock scheduled this debt at $0 on both his original and amended Schedule F.[29]

Initially, Brock was a named defendant in the state court libel case brought by the Claimants, but those claims were stayed as to Brock by this bankruptcy case.[30] No one presented any evidence concerning the status of that litigation although the court notes that in May of 2006, the Court declined to extend the automatic stay to defendant AuthorHouse, the book publisher, to postpone the state court trial then scheduled to commence on May 2, 2006.[31] Counsel represented that Claimants subsequently obtained a jury verdict for $200,000 against AuthorHouse that has been appealed. Brock scheduled Claimants and AuthorHouse as creditors in the amount of $0 on Schedule F.

---

[29] No written loan agreement between Charlene and Brock exists for this obligation.

[30] Dkt. 37. Brock testified at trial that he had been dismissed from the state court lawsuit but no such order from the state court was offered or introduced into evidence.

[31] Dkt. 57.

In addition to Brock's food stamp efforts, the nature of his financial relationship with his mother Charlene Ryan cannot help but arouse suspicion about his motives in this case. As noted above, he claims to live in her basement on Waco Street in Wichita, even though it has been demonstrated that he conducts his business and spends a lot of time, including frequent overnight stays, at the E. 26th Ct. North address. Mrs. Ryan, either directly or through the property management business, will fund his plan. It is possible that Brock writes some of Mrs. Ryan's checks for her. The Trustee introduced an exhibit containing four plan payment checks, all of which were signed "Charlene Ryan" on accounts in her name, but the signature on one check looked markedly different from the other three checks and was drawn on a different account.[32]

Also of interest is a living trust established by the elder Ryans on December 30, 2002. Under the trust terms, the Ryans direct that upon their deaths, Carl's son Michael receive $500 and Debra Brock receive $25,000 with bequests of $10,000 to Shane Brock and two other grandsons. The trust names Gary Brock as the residuary legatee. Also introduced in evidence is an unsigned amendment to this trust that replaces Gary with Gary II as the residuary legatee and eliminates the bequest to Shane Brock. Brock testified that he was not involved in making these changes. Oddly, Brock did not call Mrs. Ryan to testify concerning her involvement in Gary's employment or financial affairs, or to address any of the questions raised with regard thereto.

---

[32] Ex. 4.

-12-

## Conclusions of Law

The objections to confirming Gary Brock's amended plan and the bases for converting this case to proceedings under chapter 7 can be summarized as follows. First, Brock does not earn regular income; instead his mother funds these plan payments while he searches for outside work. Second, his pre-petition conduct, especially the food stamp imbroglio, suggests that his motives are less than honest. Similarly, the Trustee and UST argue that his lack of accuracy in scheduling assets and debts casts doubt on his motivation and sincerity in seeking chapter 13 relief. In short, they argue that his illusory "employment" by his mother (or Ryan Property Management) is a ruse designed to obscure his actual financial condition. Gary argues that he has responded to these concerns by amending his plan to reflect his slightly increased disposable income and that he will amend his plan further if and when he receives more income from actual outside employment.

## Brock does not receive "regular income" and is not eligible for chapter 13 relief.

The debtor has the burden to demonstrate by a preponderance of the evidence that his plan complies with the provisions of Title 11 and chapter 13 of the Bankruptcy Code.[33] Among those provisions is § 109(e) which requires that an individual seeking chapter 13 relief have "regular income." Brock asserts that his "regular income" is what he is paid by Charlene Ryan, his elderly mother, for his services as the manager of Ryan Property Management. In this capacity, he "manages" four properties: her house on Waco, his ex-

---

[33] *See* 11 U.S.C. § 1325(a)(1); *In re Hutchinson*, 354 B.R. 523, 531 (Bankr. D. Kan. 2006); *In re Ford*, 345 B.R. 713, 716 (Bankr. D. Colo. 2006).

-13-

wife's house on E. 26th Ct. North, and two rentals.[34]  For this, he receives $1,900 per month and, according to his Schedule I, as amended, his mother withholds no tax.  She does withhold a $50 loan payment he is making to her and, according to Brock's testimony, she deducts from his pay all of his other necessary expenses.  For a period of time prior to the confirmation hearing, Ryan also paid Brock's plan payment.  In May of 2006, he switched his mode of payment to money orders but it does not appear that Ryan withholds Brock's plan payment from his "monthly income."  It is also clear that Ryan has provided Brock with a series of loans over the years for attorneys fees and other purposes.

Also clear was the fact that Brock deemed himself unemployed and that he sought and received food stamp assistance from the State of Kansas just days before filing this case. Even if the Court ignores his misrepresentations made in securing that aid along with his prior conviction for making a false police report, and gives Brock the benefit of the doubt, he has still failed to persuade the Court that his is a regular income as that term is used in bankruptcy practice.  In his authoritative treatise on chapter 13 practice, Judge Lundin states that it is difficult for courts to project  the regularity and amount of gratuitous contributions in order to construe them as regular income for chapter 13 eligibility purposes.  In general, where the gratuity is supplied by someone other than a non-filing spouse with an arguable duty of support, "[t]he debtor will need evidence that the source of the contribution is stable

_____

[34]  No evidence was adduced at trial that Brock provides any management services with respect to the Waco or E. 26th Ct. North properties, neither of which are rented to third parties.

and that the amount is significant, regular, and likely to continue for the life of the plan."[35]
A number of courts dealing with similar issues have relied upon written commitments or
affidavits from the donor of the gratuity in determining the reliability of the source of
income.[36]  Indeed, even in the case relied upon by debtor, *In re Antoine*, the debtor's spouse
had "significant earnings" and furnished an affidavit in which she swore she would
contribute her entire income to the debtor so that he could service the proposed plan.[37]

In the present case, the only evidence of Ryan's current intent to contribute to Brock's
plan payments is Brock's use of her money to fund his plan and, as far as that goes, all of his
expenses.  We have only the debtor's word of her willingness to support him over the next
five years of Brock's plan.  Ryan did not testify, nor do we have any written indication, by
affidavit or otherwise, of her intent to continue these gratuities.  Ryan discontinued making
the plan payments herself in April after making a total of five payments.  Moreover, the
Court has no evidence upon which it could base a conclusion about the stability of the
income, its source, or the likelihood it will continue for the life of the plan.  After all, Brock
is 52 years of age, suggesting that his mother may well be in her 70's.  The Court has no
information regarding the state of Ryan's health.  It is difficult for the Court to conclude that
she will have the wherewithal to fund his plan over a 60 month period.  Indeed, if we are to

---

[35] Hon. Keith M. Lundin, *Chapter 13 Bankruptcy,* 3d Ed., § 9.10, p. 9-23 (2000 & Supp. 2004).

[36] *Id.* at notes 60 and 61, compiling numerous cases concerning gratuities as regular income.

[37] 207 B.R. 17, 18 (Bankr. E.D.N.Y. 1997).

believe the unexecuted amended trust document, Ryan intends that the debtor receive nothing from it, either as an heir or a residuary legatee. Finally, the Court has absolutely no evidence regarding the financial condition or stability of Ryan Property Management, the alleged source of income. The debtor had the burden of proof on this point and did not carry it. The Court cannot conclude as a matter of fact (or law) that he has regular income. Gary Brock is therefore ineligible for chapter 13 relief on these facts.[38]

### Brock did not demonstrate good faith.

Although the Court's conclusion that Brock lacks regular income seals the fate of his plan, the Trustee's and UST's objections concerning the debtor's lack of good faith require some comment, particularly in light of the UST's pending motion to convert.[39] Determining whether the debtor has proceeded in good faith requires measuring his conduct against the "Flygare Factors."[40] The eleven *Flygare* factors are:

---

[38] The Court is not without doubt about the efficacy of pressing this point. If this case were to proceed in chapter 7, the trustee would be charged with what appears to be a difficult task of finding assets to pay claims. Under the present plan, the creditors would at least have some hope of receiving a few thousand dollars on their claims, assuming, of course, that Mrs. Ryan came through for the entire 60 month plan period. It also strikes the Court that an order delaying revesting of the estate's assets until completion of the plan would protect the benefits of Brock's possible improvement of position, inheritance, or other good fortune for the creditors.

[39] *See* 11 U.S.C. § 1325(a)(3).

[40] "As a general matter, a determination of good faith must be made on a case by case basis, looking at the totality of the circumstances. *See Pioneer Bank v. Rasmussen (In re Rasmussen)*, 888 F.2d 703, 704 (10th Cir.1989). 'In evaluating whether a debtor has filed in good faith, courts should be guided by the eleven factors set forth in *Flygare v. Boulden*, 709 F.2d 1344, 1347-48 (10th Cir.1983), as well as any other relevant circumstances.' *Robinson v. Tenantry (In re Robinson)*, 987 F.2d 665, 668 (10th Cir.1993) (footnote omitted)." *In re Young*, 237 F.3d 1168, 1174 (10th Cir. 2001).

-16-

(1) the amount of proposed payments and the amount of the debtor's surplus;
(2) the debtor's employment history, ability to earn and likelihood of future
increases in income; (3) the probable or expected duration of the plan; (4) the
accuracy of the plan's statements of the debts, expenses and percentage
repayment of unsecured debt and whether any inaccuracies are an attempt to
mislead the court; (5) the extent of preferential treatment between classes of
creditors; (6) the extent to which secured claims are modified; (7) the type of
debt sought to be discharged and whether any such debt is non-dischargeable
in Chapter 7; (8) the existence of special circumstances such as inordinate
medical expenses; (9) the frequency with which the debtor has sought relief
under the Bankruptcy Reform Act; (10) the motivation and sincerity of the
debtor in seeking Chapter 13 relief; and (11) the burden which the plan's
administration would place upon the trustee.[41]

The weight given to each factor will necessarily vary with the facts and circumstances of

each case."[42]  As with other confirmation requirements, the debtor has the burden to show

good faith.[43]

The factors of particular interest here relate to the debtor's employment history and

prospects, the accuracy of his statements of debts and expenses and whether those mislead

the Court, preferential treatment of classes of creditors, the motivation and sincerity of the

debtor, and the burden administration might place on the trustee.  As noted above, the

debtor's income prospects appear dim at this point.  The debtor is 52, appears to be in good

health, is articulate, and is educated.  Nonetheless, he  has not worked for four years (since

2001) except for his mother's property management company, a job he purportedly began

one week before filing this case.  He receives no paycheck from Ryan Property Management

---

[41] *Flygare,* 709 F.2d at 1347-48 (quoting *In re Estus*, 695 F.2d 311, 317 (8th Cir.1982)).

[42] *Id.* at 1348.

[43] *In re Tomasini*, 339 B.R. 773 (Bankr. D. Utah 2006).

-17-

but instead has his monthly living expenses paid. Brock "takes home" a monthly stipend of $150. At present, he does not appear to have the ability to earn outside income based on the evidence before the Court and, as the Court has concluded above, he lacks regular income. His schedules were not entirely accurate and notably erroneous in omitting the substantial debt he owes his mother and which he supposedly plans to repay outside the chapter 13 plan.[44]

While the Court deems the omission of the food stamp income as de minimis, the other inaccuracies and inconsistencies add up and, at some level, pique the Court's curiosity about the debtor's motives. The Court is particularly curious about the extent to which the debtor has access to, or actually controls, his mother's financial affairs and assets, including those referenced in the trust. This is compounded by debtor's failure to produce his mother as a witness at trial to demonstrate that she is firmly behind his plan, intends to support him over the remaining plan period, and is capable of doing so. The Court wonders whether his mother's conspicuous absence from these proceedings was calculated and deliberate. Even more disturbing is his apparent effort to disguise or shield the loan payments to his mother by failing to mention them in the plan, but reporting them on Schedule J. This suggests an intention to prefer her over all other creditors for no apparent reason. While Brock purports to directly repay his mother $50 a month (outside the trustee's oversight), all other unsecured creditors would share pro-rata in what remains of the monthly plan payment of $101 or

_____

[44] The amended plan makes no mention of paying this debt outside the plan and Charlene Ryan has submitted no proof of claim.

$151.[45]

The motivation and sincerity of the debtor creates the most question here. Only a few weeks before filing this case, the debtor successfully made a fraudulent application for food stamps in which he employed, among other things, a letter purporting to have been written by his step-father who had died six weeks before the letter's date. In addition, his food stamp application misstated where he lived and what his circumstances were. His stated motivation in pursuing this case is to gain the no-longer available super discharge afforded debtors who completed their plans under former § 1328. One assumes that debtor especially wishes to discharge whatever obligation he may have to the Claimants arising out of their state court tort claims against him. This state case has been tried and a jury verdict was entered in favor of the Claimants against the book publisher, finding that the publisher had in fact libeled the Claimants.

Finally, the Court questions how the Trustee can administer this case accurately in the interest of creditors. The debtor has a track record of untruthfulness, even under penalty of perjury. He has not filed a tax return since 2001. He receives no pay stubs or other payment information from Ryan Property Management. He was reticent at best about his involvement with his mother's affairs. All of this presents only the prospect of continuing difficulty for the Trustee trying to assure herself and the creditors that Brock is indeed paying what he

---

[45] Brock's amended plan would result in a dividend of roughly $8,000 for unsecured claims totaling about $205,000, *not including the potential claims asserted by Claimants*, a dividend of less than 5%.

should be paying his unsecured creditors.

In short, the Court has significant doubt that debtor has proceeded in good faith. Chapter 13 should be open to every eligible debtor who seeks to rearrange his affairs, work hard to produce income, and pay something to his creditors. While this debtor nominally purports to do that, the odd combination of facts and circumstances in this case belie his intent and simply preclude confirmation of this plan even were the debtor eligible for relief under this chapter.

### The Trustee's Motion to Convert

The UST moves for an order converting this case to chapter 7. In light of the foregoing findings and conclusions denying confirmation of the debtor's chapter 13 plan, consideration of whether this case should be dismissed or converted is appropriate. Under § 1307(c), upon a finding that cause exists to convert or dismiss a case, the Court must determine which is in the best interest of the creditors. The UST asserts that the debtor's numerous inaccuracies in his schedules and other filings, combined with his untruthful conduct pre-petition warrant conversion of the case. The UST contends that these inaccuracies and untruths are enough to constitute unreasonable and prejudicial delay under § 1307(c)(1). This Court agrees. The Court has further concluded that the debtor has not proceeded in good faith.[46] Moreover, the Court has concluded that, by virtue of the debtor's

---

[46] *See In re* Davis, 239 B.R. 573, 576 (10th Cir. BAP 1999) (Lack of good faith in commencing a chapter 13 case is cause for dismissal under § 1307(c)); *In re Armstrong*, 303 B.R. 213 (10th Cir. BAP 2004) (Same *Flygare* factors used in determining whether proposed chapter 13 plan should be denied confirmation for debtor's lack of good faith may be considered in deciding whether cause exists for dismissal of chapter 13 case based upon debtor's lack of

-20-

financial arrangements, the debtor is not eligible for relief.  Indeed, it appears the debtor has been in a continuing state of ineligibility throughout the process because he has not been employed and has essentially been bankrolled by his mother.

This case has now been pending since October 14, 2005.  It took a year to get to trial. While the Court has several older chapter 13 cases, part of the delay in bringing this case to a head has been the debtor's inability to provide accurate information to all concerned.  As noted above, the debtor is ineligible for this relief.  The Court has denied confirmation and is hard pressed to see how in his present circumstances, the debtor could amend his plan in such a way that it could be confirmed.  Section 1307(c)(5) renders the denial of confirmation and denial of a request for time in which to modify that plan a further ground for dismissal or conversion.  Because the debtor has not had an opportunity to request that relief here, that subsection will not support dismissal or conversion now, but the presence of unreasonable prejudicial delay and lack of good faith do.

As noted above, there are many questions about the degree and extent of the debtor's assets.  The debtor drives an expensive vehicle his mother bought for him, lives at least part of the time in a home he owns with her, and receives all his income from her.  The extent of Brock's control over his mother's financial affairs, including Ryan Property Management, is unknown.  He has a number of creditors and substantial claims have been filed in his case. It is possible that he has more assets than he has divulged so far and, for that reason, the best

_____

good faith, citing *Gier v. Farmers State Bank (In re Gier)*, 986 F.2d 1326, 1329-30 (10th Cir. 1993)).

interests of the creditors would appear to be best served by converting this case to proceedings under chapter 7. The UST's motion should be granted and the UST is directed to appoint a chapter 7 case trustee immediately.

### Summary

The debtor is ineligible for chapter 13 relief because he lacks regular income, a requirement for confirmation under § 109. The debtor has failed to proceed in good faith and his plan must be denied confirmation on that basis. Grounds exist that support conversion or dismissal of this case and the creditors' best interests will be better served by converting this case to proceedings under chapter 7.

Debtor's objections to the claims of Rebecca Brandewyne (Claim No. 4) and Beverly Thornton (Claim No. 6) shall be set for evidentiary hearing as the Court's calendar permits.

# # #